UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════

BRIAN RAYMOND SCANLON,

                              Plaintiff,

        v.                                        **DECISION AND ORDER**
                                                  15-CV-0145-A

CAROLYN W. COLVIN, ACTING
COMM. OF SOCIAL SECURITY,

                              Defendant.

═══════════════════════════════

        The Plaintiff, Brian Raymond Scanlon, who is represented by counsel,

brings this action pursuant to 42 U.S.C. § 405(g) for review of the final decision of

Defendant Commissioner of Social Security denying Plaintiff Scanlon's

application for Disability Insurance Benefits ("DIB").   Presently before the Court

are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of

the Federal Rules of Civil Procedure.  Dkt. Nos. 7, 12.

## BACKGROUND

### A.    *Procedural History*

        Plaintiff Scanlon protectively filed an application for DIB on May 14, 2012,

alleging disability beginning May 11, 2012, due to traumatic brain injury, knee

and neck injuries, and inability to deal with stress.  T. 160.[1]  His initial application

was denied, and a hearing followed before Administrative Law Judge ("ALJ")

---

[1]  Citations to "T.__" refer to the pages of the Administrative Transcript.

Gitel Reich by video teleconference on June 11, 2013.  T. 39-73, 80, 87.  After the ALJ issued a decision finding that Plaintiff was not disabled, Plaintiff requested Appeals Council review of the hearing decision.  T. 1-7, 11-19, 28. On December 17, 2014, the Appeals Council denied Plaintiff's request, and the ALJ's determination became the Commissioner's final decision. This action followed.

## B.    The ALJ's Decision

In applying the five-step sequential analysis required by 20 C.F.R. §§ 404.1520, 416.920, *see Lynch v. Astrue*, No. 07-CV-249, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008) (detailing the five steps), the ALJ found:  (1) Plaintiff Scanlon did not engage in substantial gainful activity since his alleged onset date of May 11, 2012; (2) he had the severe impairments of degenerative joint disease of the bilateral knees, status post-surgery; neck pain, status post-cervical fusion; history of superior cerebellar cistern mass; cognitive impairment, status post-traumatic brain injury; and major depressive disorder; and (3) his impairments did not meet or equal the Listings set forth at 20 C.F.R. § 404, Subpt. P, Appx. 1. The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, with the exception of performing simple work with occasional contact with people; (4) Plaintiff could not perform his past relevant work; and (5) if Plaintiff had the RFC for a full range of sedentary work, the Grids[2]

---

[2] "The Grids," or the Medical Vocational Guidelines, divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. § 404, Subt. P, Appx. 2.  Each category has its own Grid

would direct a finding of "not disabled," and Plaintiff's additional limitations and little or no effect on the occupational base for unskilled sedentary work. Accordingly, the ALJ concluded that the Plaintiff was not disabled under the Social Security Act.  T. 13-18.

## DISCUSSION

### A.    Scope of Review

A federal court should set aside an ALJ's decision to deny disability benefits only where it is based on legal error or is not supported by substantial evidence.  *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks omitted).

### B.    Relevant Medical Evidence

On April 30, 2007, Plaintiff Scanlon fell asleep while driving to work for an HVAC company and collided with another vehicle, breaking three vertebrae in his neck, lacerating his spleen, and injuring his brain.  T. 224.  Upon hospital admission that day, Plaintiff underwent posterior fusion from C5-C6-C7 to stabilize his cervical spine.  He later underwent bilateral knee surgery in October, 2007.  *Id.*  Later, a supracerebellar mass was discovered in Plaintiff's brain and was identified as meningioma.  T. 291-93, 300-01, 312.  On May 28, 2008,

which takes into account the claimant's age, education, and work experience. Based on these factors, the Grids indicate whether a claimant can engage in any other substantial gainful work which exists in the national economy.

Plaintiff underwent gamma knife radiosurgery to remove the mass. T. 307-310. Plaintiff continued to experience headaches, knee pain, neck pain, and cognitive issues following those procedures. T. 224-23, 236-53, 255-58, 277-88.

On June 1, 2012, Plaintiff Scanlon saw Dr. Gary Wang for post-injury follow-up. Plaintiff reported that his occipital area pain was essentially controlled, with occasional headaches lasting one to two hours, some tingling on the soles of his feet, bilateral knee pain, and neck stiffness. Examination revealed bilateral knee tenderness with signs of fluid collection, positive crepitus sign with normal, active, or passive range of motion. Plaintiff also exhibited tenderness around the medial side of the kneecap. He was alert and well-oriented, with significantly improved mood and motivation. Sensation was slightly decreased on the heels and side of the ankle, and gait was slightly wide-spaced. Plaintiff was assessed with post traumatic brain injury with late effects; insomnia; knee pain, foot/ankle pain; and functional deficits. He was prescribed Celexa, Remeron, trazadone, Lamictal, and knee sleeves. T. 350-51.

On June 5, 2012, Plaintiff Scanlon saw a physician assistant at Bradford Orthopedic and Sports Medicine Group. Upon examination, the Plaintiff showed very mild tenderness in his knees along the medial joint lines, mildly positive McMurray's test, some patellofemoral crepitation, and no pain on compression or mobilization, very good range of motion, and negative straight leg raises. T. 387. Plaintiff received two steroid injections in his knees on June 26 and June 28, 2012. T. 386.

Plaintiff Scanlon saw Dr. Alice Yu on June 8, 2012 for a physical examination.  He reported tingling in his soles after standing for long periods, with a pain level of 8/10.  He complained of constant knee pain which worsened at night, with a pain level of 10/10.  He took no medication for his pain.  Plaintiff had a decreased range of motion in the cervical spine and crepitus in his knees, with normal strength and sensation in his arms, legs, and feet.  Plaintiff was prescribed Gabapentin for foot and knee pain.  T. 318.

A June 11, 2012 electromyography/nerve conduction study showed Plaintiff Scanlon had a history of bilateral S1 radiculopathy without exacerbation; left tarsal tunnel syndrome, medial branch involve more than lateral; and no evidence of peripheral polyneuropathy of lower limbs.  T. 337.

On June 7 and June 25, 2012, Plaintiff presented to Dr. Michael Santa Maria for cognitive and psychological evaluations, where he reported difficulty with memory, problem solving, and contextualizing complex tasks since his accident.  T. 324-25.  Plaintiff last worked for an alarm and security company from October, 2011 to May, 2012, but was let go for performing his duties too slowly.  He was independent in self-care, housekeeping, cooking, shopping, and driving.  T. 325-26.

Plaintiff Scanlon's neurological test data revealed impairments in three of six sensory and motor functioning categories; that he has borderline to average intelligence; low average to average academic abilities; impairment in one of three language categories; mild deficits in three of 20 learning and memory

categories; normal or adequate results for memory and effort; and impairment in one of nineteen executive functioning categories. The examination showed Plaintiff was otherwise normal, average, or borderline.  T. 327-29.  Plaintiff's mood and personality functioning were assessed as "moderate to severe depressive symptoms." T. 329. Dr. Santa Maria's impressions were mild cognitive impairment, post-severe traumatic brain injury; major depressive disorder, moderate; and history of superior cerebellar cistern mass.  T. 330.  The doctor recommended continued pharmacotherapy for depression, and, although Plaintiff was not cognitively capable of handling his previous job in HVAC installation, he nonetheless demonstrated the cognitive capacity to work in a less demanding occupational role.  T. 331-32.

On August 9, 2012, State Agency psychiatric consultant Dr. P. Kudler completed a Psychiatric Review Technique in connection with Plaintiff Scanlon's application, finding that with regard to Listings 12.02 (Organic Mental Disorders) and 12.04 (Affective Disorders), Plaintiff had mild limitations in activities of daily living; moderate limitations in maintaining social functioning, and moderate limitations in maintaining concentration, persistence or pace; and had no episodes of decompensation of extended duration. There was no evidence to establish the presence of "C" criteria of the Listings.[3] T. 357-68. Dr. Kudler also completed a Mental Residual Functional Capacity Assessment finding no marked

---

[3] "Paragraph C" refers to the additional functional criteria contained in Sections 12.02, 12.03, 12.04, and 12.06 of the Listings for Adult Mental Disorders. 20 C.F.R. § 404, Subpt. P, Appx. 1, § 12.00 *et seq.*

limitations in any of the functional categories.  Citing the previous evaluation by Dr. Santa Maria, Dr. Kudler opined that Plaintiff suffered moderate depression and subtle cognitive impairment, and remained capable of performing simple, repetitive work. T. 353-55.

An August 15, 2012 magnetic resonance imaging ("MRI") scan of Plaintiff Scanlon's brain showed no evidence of recurrent meningioma after gamma knife surgery in the right cerebellar hemisphere, but did show mild chronic pansinusitis.  T. 438.

Plaintiff Scanlon returned to Bradford Orthopedic on August 17, 2012. His left knee was doing "very well," although he exhibited slight tenderness along the medial joint line of the right knee. The physician assistant recommended daily strength exercises, a right knee brace, weight loss, and over-the-counter medications.  T. 392.

Plaintiff Scanlon saw Dr. Wang on August 28, 2012, with reports of occasional headaches of one to two hours.  Plaintiff's foot pain had improved to a tolerable level after a shoe adjustment, but he still had knee pain and neck stiffness and became tired easily.  Upon examination, there was bilateral knee tenderness without signs of fluid collection, crepitus in the knee and tenderness in the kneecap.  Plaintiff was to begin taking Namenda to help his memory recovery and Lamictal to help his mood disorder and neuropathic pain.  With respect to his knee pain, the EMG study ruled out radiculopathy and it was suggested that he continue with Euflexxa injections and wear knee sleeves.  With

regard to functional deficits, Dr. Wang opined that Plaintiff was not "totally disable[d] physically," and encouraged him to participate in simple job training and restart work. T. 378-79.  Dr. Wang also completed a Medical Report Form for New York State Office of Vocational and Education Services for Individuals with Disabilities ("VESID") in which he stated that Plaintiff was able to drive and use public transportation, that he suffered mood disorder and memory deficits and was on medication, and that he should avoid prolonged standing, staying in one position for prolonged amount of time, and noise. T. 380-81.

Approximately two months later, Dr. Wang completed another medical questionnaire for VESID, noting that Plaintiff Scanlon could work up to six hours per day, three to four days per week. Dr. Wang noted he could lift, carry, and push/pull up to 20 pounds, walk for two hours a day, stand for two hours, and sit for four hours. Plaintiff was to avoid climbing, stooping, bending, high places, and noise. His medication may result in decreased concentration and prolonged sitting could produce back pain. Dr. Wang recommended that Plaintiff start with a "simple, part-time job." T. 390-91.

On November 26, 2012, Plaintiff Scanlon saw Dr. Kevin Ouweleen at Lakeshore Orthopedic Group for a Worker's Compensation Office Visit with respect to bilateral knee injuries sustained in a work-related motor vehicle accident in 2007. Plaintiff reported daily knee pain and a short temper since his accident. During the examination, he had good range of motion in his knees with no significant tenderness, but some discomfort with compression. Steinmann's

and McMurray's tests were negative.  Plaintiff was assessed with bilateral knee pain, patellofemoral in origin, status post a work-related motor vehicle accident. Dr. Ouweleen recommended strength training and repeat MRIs of both knees, and assessed that Plaintiff "would be considered to have a moderate partial disability in respect to his knees."  T. 411-12.

On November 27, 2012, Plaintiff Scanlon saw Dr. Jonathan Costa at Psychophysical Rehab & Recovery in Erie, PA for a physical medicine evaluation.  Following examination, Dr. Costa's impressions were: chronic pain with cervical strain sprain and C1 right C3 left and status post C4-C6 decompression and fusion; migraine-like cervicogenic headache; mild gait disability; thoracic strain sprain with T1-12 scoliosis right and lumbar strain sprain with L1-5 scoliosis left; myofascial syndrome; closed head injury with amnesia, ataxia, anosognosia, depression, behavior disorder, and perceptual and cognitive deficits; failed neck syndrome with scar tissue; and cervical myelopathy as most probable source of lower extremity symptoms.  There was no current evidence of thoracic outlet syndrome, facet syndrome, or sacral strain sprain or derangement, although derangement and pelvic obliquity and rotation may be recurrent.  The doctor recommended that Plaintiff discontinue Remeron, Namenda, and Trazodone, but continue Celexa, increase his Lamictal, and begin Topamax, along with topical medication for the orbits and neck.  T. 420-23.

On January 7, 2013, Plaintiff Scanlon returned to Dr. Ouweleen, reporting knee pain at night with difficulty sleeping, trouble with long car rides, and sitting

for long periods of time.  MRI scans of both knees showed small effusions but no significant injury.  Plaintiff had good quadriceps strength, and range of motion was to 110 degrees in both knees.  There was pain with patellar compression, but no tenderness and Steinmann's test was negative.  Dr. Ouweleen discussed possible abrasion chondroplasty, and recommended a continuing home exercise program. Plaintiff was considered totally disabled with a moderate partial disability in his knees.  T. 409.

Plaintiff Scanlon saw Dr. Costa on January 29, and March 5, 2013 for complaints of difficulty sleeping, and bothersome occasional tingling and numbness in the back of his head.   During the January 29 visit, Dr. Costa observed issues with word substitution and word finding.  Plaintiff's medications were adjusted to help his memory and sleep problems, and he was also given cream for his right knee.   T. 416-18.   At a follow-up appointment, Plaintiff reported that he still had difficulty sleeping, and the prescribed cream was helping "his knee a little bit if he remember[ed] to use it," but did not help his "orbits . . . [or] back of the neck."   T. 414.   Dr. Costa noted that Plaintiff's forgetfulness also appeared "somewhat worse."   *Id.*  Upon examination, his gait, station, sitting, balance, mood, social interaction, and anxiety were all at his baseline. *Id.* Noting "some success [with] current medications, the doctor adjusted Plaintiff's prescriptions and recommended "psychological family relationships counseling for TBI."  T. 415.

On April 15, 2013, Plaintiff Scanlon saw Dr. Michael Landi for a neurosurgical consultation, reporting recurrent headaches in his temples and chronic visual disturbances, including double vision.  Upon examination, his vision was normal, he had full strength in his arms and legs, and normal gait and station.  He also reported neck pain, but denied any radiation to his arms.  His neck was stiff and he heard cracking in his neck when he moved it.  Plaintiff had not received any physical therapy or treatment for his neck, but stated that Bengay and Advil improved his pain.  Lifting, lying down, and walking exacerbated his pain.  On examination, motor testing, reflexes, and sensation were normal throughout.  Straight leg raise testing was negative and gait and station were normal.  Plaintiff was assessed with cervical pain, and was to undergo an MRI and x-ray of the cervical spine and trial of physical therapy.  Dr. Landi found Plaintiff to be 75% temporarily impaired.  T. 429-32.

Plaintiff Scanlon attended physical therapy at Olean Physical Therapy Professionals, one to two times per week from April 2 through May 7, 2013. Plaintiff reported continued bilateral knee soreness, which increased throughout the day, and neck stiffness, with variations in improvement and deterioration throughout his treatment.  Plaintiff tolerated the treatment well.  T. 440-51.

An April 22, 2013 MRI scan of Plaintiff Scanlon's brain showed a focal area of encephalomalacia[4] in the right cerebellar hemisphere consistent with

---

[4] Encephalomalacia is the softening or loss of brain tissue after cerebral infarction, cerebral ischemia, infection, craniocerebral trauma, or other injury.
See http://www.ncbi.nlm.nih.gov/pubmed/22134284

postoperative change.   There was also mild chronic bilateral ethmoid and maxillary sinusitis.  The MRI was otherwise unremarkable.  An April 22, 2013, x-ray of Plaintiff's cervical spine showed normal postoperative changes at C5-6 and C6-7.  T. 425-26.

Plaintiff Scanlon returned to Dr. Landi for a neurosurgical re-evaluation on April 30, 2013, during which he reported a recent exacerbation in his cervical pain with occasional radiation to his scalp.  His neck was stiff, but he denied any radicular symptoms in his arms.  He had attended physical therapy, which did not provide relief for his symptoms.  He denied clumsy hands, unsteady walking, electric shock sensations in his neck, or weakness in his arms or legs.  On examination, Plaintiff had full strength in his arms and legs and normal reflexes, and full range of motion in his cervical spine.  The cervical spine was non-tender to palpation, but there was evidence of paraspinal muscle spasms.  His gait and station were normal.   Dr. Landi recommended a trial of medical massage therapy, continuation of physical therapy, and trigger point injections.  T. 427-28.

On July 1, 2013,[5] Dr. Landi completed a treating Physician's Functional Capacity Assessment, in which he opined that Plaintiff Scanlon was unable to perform any lifting, carrying, pushing, or pulling; could stand/walk less than two hours per day; and sit less than six hours per day. He concluded the Plaintiff was

---

[5] The records dated July 1, 2013 onward were submitted to the Appeals Council for consideration and were not part of the record before ALJ Reich.

not working and had a 75% temporary impairment for the time period of May 11, 2012, through July 1, 2013.  T. 452.

On July 15, 2013, Plaintiff saw Dr. Donald McAleer for a neuropsychological consultation.  Upon evaluation, Dr. McAleer concluded that Plaintiff had "actually recovered quite well from the severe traumatic brain injury." T. 457.  His motor functioning had improved, but was still far below expectations for someone his age.  General cognitive scores had improved, specifically in the area of sustained attention.  His working memory index had also improved from the 6th percentile the previous year to the 37th percentile, and processing speed had improved from low average to high average.  He continued to show mild deficits in accuracy of recall and he showed variable decision making and planning limitations.  There were also problems with overall organization, decision making, ability to apply feedback, and self-correction.

The doctor assessed Plaintiff Scanlon's mood functioning as "moderate to severe," as Plaintiff continued to exhibit depression, anxiety, low self-esteem, sensitivity to others, and quick and ready irritability.  T. 457.  He retained fairly good concrete skills, but showed problems applying "these tasks to new learning situations."  T. 458.  Dr. McAleer opined that there was a cognitive basis for disability enhanced by his mood capacities.  T. 454-58.

**C.    *Non-Medical Evidence***

On June 13, 2012, Plaintiff Scanlon's wife completed a Function Report on Plaintiff's behalf which indicated that Plaintiff helped dress, feed, and bathe his three children and care for the family pets.  Since his injury, he had a hard time dealing with stress, struggled to complete tasks on time, had lost confidence in his abilities, and his pain kept him awake at night.  He had no problems attending to his personal care, but needed reminders to take his medication.

Plaintiff Scanlon or his wife would prepare breakfast, lunch, and dinner on a daily basis.  He was able to do laundry, go grocery shopping, and make household repairs, although his father would sometimes help him with maintenance around the house.  He went outside daily, and could drive and go out alone. Plaintiff was able to pay bills, count change, and handle a savings account. His hobbies included hunting, watching television, spending time outdoors, camping, riding all-terrain vehicles (ATVs), and spending time with family.  Many of these activities were limited because he became stressed easily. Plaintiff would socialize on the phone and attend family gatherings, but he had become quieter since his accident and had a harder time socializing with others.

Plaintiff had no difficulties lifting, but his pain resulted in difficulties standing, walking, sitting, using stairs, kneeling, and squatting. He could reach and use his hands.  Plaintiff also reported double vision when lying down or trying to see things at an angle.  He used a knee brace prescribed by his doctor. He had problems paying attention and finishing what he started, and could follow written, but not spoken instructions.  Plaintiff also had problems with authority

and would become frustrated when he felt that someone was pressuring him. He had lost a job due to problems getting along with others. He reported difficulty dealing with stress and remembering things.  T. 175-83.

Plaintiff Scanlon's wife also completed a Pain Questionnaire on his behalf, reporting that after his accident, he began experiencing a stabbing pain on the soles of his feet, stiffness in his neck, and aching in his knees.  The pain occurred every day and was triggered by sitting or standing for too long.  He took Advil and Gabapentin for the pain, but it provided no relief.  His daily activities included housework and playing with his children, but he needed to take breaks often.  T. 183-85.

A Headache Questionnaire indicated that Plaintiff experienced headaches approximately three days a week that would vary in duration from 30 minutes to three hours.  He described the headaches as extreme pressure and sometimes a stabbing sensation at his temples.  During a headache, he was sensitive to light and sound, and medication did not provide relief.  When he experienced a headache, he had to stop all activity, lie down, and close his eyes in a dark room. T. 185-87.

Plaintiff Scanlon also completed a Work History Report. From May 2001 through January 2009, Plaintiff worked for an HVAC company installing heating and air conditioning systems.  At this job he would stand walk, climb, kneel, crouch, crawl, handle, and write for eight hours a day, lift 100 pounds or more and frequently lift 50 pounds or more.

From April 2009 through October 2011, Plaintiff Scanlon worked at a hospital performing maintenance where he mowed, weed wacked, and repaired or maintained hospital facilities. He would stand, sit, walk, climb, kneel, stoop crouch, crawl, handle, and write for eight hours a day and frequently lift up to 10 pounds.

Plaintiff Scanlon had two years of college and specialized training in heating and cooling systems.  T. 172.  From October 2011 through May 2012, he worked for a security system company installing or repairing security systems. There, he would stand, walk, climb, stoop, crouch, crawl, handle, and write for eight hours a day, lift up to 10 pounds and frequently lift less than 10 pounds.  T. 188-95.

Plaintiff Scanlon testified before the ALJ at the June 11, 2013 hearing, during which he told the ALJ that he continued to work after his August 2007 accident, but his brain injury prevented him from hold a job because he "couldn't keep [his] work schedule."  T. 44.  Following his accident, Plaintiff worked for the same HVAC company in a different capacity, followed by a job in hospital maintenance and at a locksmith company.  He left the hospital position due to disagreements with his boss, and he was let go from locksmith position because he was "not picking [it] up fast enough."  T. 46.

Plaintiff Scanlon testified that he was unable to work due to knee pain.  He was unable to walk for very long or use stairs, and the pain would occur after 30 minutes of sitting.  Although his knee pain had initially improved after the

-16-

accident, it was worsening at the time of the hearing.  He used Icy-Hot, elevation, applying ice, and Advil for pain. He told the ALJ that his medication did not provide relief and had no side effects.  Plaintiff could stand for 30 minutes or walk for approximately 200 yards before the pain began.  Plaintiff also testified that he experienced pain on the soles of his feet from standing or walking, tingling in his hands and shoulders, neck pain and stiffness, and headaches, which were treated by lying down.  Medication did not relieve his headaches.

Plaintiff Scanlon rested approximately four hours per day and would do "a little bit of work" around the house such as cooking and cleaning. T. 53.  Since his brain injury, Plaintiff had become moody and unable to tolerate loud noises. He would become angry "a couple times a day," but admitted that he had problems getting along with people at work prior to his injury. T. 55-56. Plaintiff had problems finishing tasks within an allotted amount of time due to stress or forgetfulness. He was unable to watch television because he was unable to concentrate.  Plaintiff also had trouble finding the right words when speaking. T. 42-66.

Plaintiff's Scanlon's wife testified before the ALJ, echoing Plaintiff's issues with stress, difficulty coping, panic, and forgetfulness.  T. 66-73.


**D.    *Legal Analysis***

  **1.    Stress Assessment**

Plaintiff Scanlon first contends that the ALJ erred in not conducting an individualized assessment into his ability to handle stress.  Pl. Mem. (Dkt.  No. 7-1) 19-21.  The ALJ had concluded that Plaintiff had no more than moderate mental impairments, and had a mental RFC assessment of simple, low contact work.  T. 14, 16.

Social Security Ruling ("SSR") 85-15 "emphasizes the need to carefully evaluate a claimant's ability to deal with stress in the workplace." *Sheffield v. Astrue*, 2012 WL 5966610, *2 (N.D.N.Y. 2012) (citing SSR 85-15, 1985 WL 56857, *5-6 (1985)).   According to Plaintiff, the record indicates that Plaintiff found loud noises, taking directions, working within a time limit, and dealing with changes, uncertainty, and imperfection to be stressful situations, which the ALJ failed to address.   Pl. Mem. at 20.

The ALJ did, however, assess the stress-related limitations in formulating Plaintiff Scanlon's RFC.  T. 15-17.   In the written opinion, ALJ Reich noted Plaintiff's difficulty coping and obsessive traits, and gave significant weight to Dr. Santa Maria's opinion that Plaintiff should seek employment in a "less demanding work role."  T. 15-16.  In light of Plaintiff's limitations in dealing with others, the ALJ restricted his RFC to "simple work that has only occasional contact with people." T. 14.   Her conclusion was supported by Plaintiff's medical records, which demonstrated progress with regard to his cognitive abilities following his accident, and the presence of depression.  T. 15.  Moreover, Dr. Wang's opinion that Plaintiff was responding well to current medications, that his mood was more

stabilized, and that he was encouraged to participate in simple job training, is consistent with the RFC that Plaintiff could seek and maintain lesser work than previously performed.   T. 16.   Likewise, Dr. Costa reported in January of 2013 that Plaintiff had a "better affect and social interaction . . . with no anxiety present."  T. 16.  Finally, the medical evidence of Dr. Kudler's Mental Residual Functional Capacity Assessment, which indicates, at most, moderate limitations in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting, supports the ALJ's conclusion.  T. 16, 353-54.

On the basis of this assessment, Plaintiff Scanlon's ability to perform simple work with occasional contact with others adequately reflects his limitations with regard to stress and is supported by the evidence of record. *See Steffens v. Colvin*, 2015 WL 9217058, *4 (W.D.N.Y. 2015) ("the RFC finding requiring low contact with coworkers and the public adequately accounted for plaintiff's stress"); *Reyes v. Colvin*, No. 14-CV-734, 2016 WL 56267, *6 (W.D.N.Y. Jan. 5, 2016) ("In the court's view, although the ALJ did not specifically include stress limitations in his RFC assessment, his reliance on the findings and observations of the consultative medical sources in terms of their consideration of plaintiff's stress-related functional limitations, as well as his comprehensive consideration

of the hearing testimony, objective medical evidence, and treating and consultative medical source opinions, represents the kind of thorough, individualized mental RFC evaluation contemplated by SSR 85-15 and the overall requirements of the Social Security regulations and rulings").

### 2.   Opinion Evidence

Plaintiff Scanlon next argues that the ALJ erred in assessing the medical opinions of Drs. Wang and Ouweleen.  Pl. Mem. at 21-26.  In her decision, ALJ Reich gave "considerable weight, but not significant weight, to the overall assessment of treating source Dr. Wang," and did not discuss the opinion evidence of Dr. Ouweleen. T. 17.

It is well-settled that the medical opinion of a plaintiff's treating physician must be given "controlling" weight if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Green-Younger*, 335 F.3d at 106.  Medically-acceptable clinical and laboratory diagnostic techniques include "'a patient's report of complaints, or history, [a]s an essential diagnostic tool.'" *Id.*, 335 F.3d at 107 (quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997)).

As a rule, the Commissioner must "'give good reasons in its notice of determination or decision for the weight it gives [plaintiff's] treating source's opinion.'" *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (quoting 20 C.F.R. §§ 404.15279(d)(2), 416.927(d)(2)). "Those good reasons

must be 'supported by the evidence in the case record, and must be sufficiently specific.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting Social Security Ruling 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996)). Because the "good reasons rule" exists to "ensur[e] that each denied claimant receives fair process," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007), an ALJ's "'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley*, 581 F.3d at 407 (quoting *Rogers*, 486 F.3d at 243).

The ALJ's analysis comported with SSR 96-2p by properly observing that the limitations set forth in the Functional Assessment were overly restrictive in light of Dr. Wang's own treatment reports that indicated the presence of moderate, but not debilitating foot, ankle, and knee pain. T. 17. Among other things, the ALJ cited to Dr. Wang's notes indicating that Plaintiff's foot pain had improved as of August 28, 2012, and that it was recommended for Plaintiff to participate in simple job training and restart work. *Id.* She observed that the balance of the record also supported a lesser weight determination of Dr. Wang's Functional Assessment, which included, among other things, improvements noted in Plaintiff's right and left knee by other treating physicians, recommendations for conservative treatment, such as weight loss and daily exercises, an assessment of only a "mild gait disability," and Plaintiff's stable

work history for nearly five years post-accident. T. 16-17, 44-46, 188-93. Because the ALJ properly applied the treating physician rule and provided the requisite good reasons for not giving Dr. Wang's Functional Assessment controlling weight, remand is not warranted.

With respect to the opinion evidence of Dr. Ouweleen, who examined Plaintiff Scanlon twice, "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the Court] to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). Here, Dr. Ouweleen did not perform a function-by-function analysis, but reported the results of a January 7, 2013 worker's compensation examination of Plaintiff, after which he concluded that Plaintiff was "overall . . . totally disabled," with a moderate partial disability related specifically to his knees. T. 411. Contrary to Plaintiff's argument, *see* Pl. Mem. 23-24, the ALJ was not obligated to accord significant weight to the physician's finding of disability. *See Osbelt v. Colvin*, 2015 WL 344541, *3 (W.D.N.Y. 2015) (physician's letter "which concluded that '[claimant] is unable to work in any significant capacity given ongoing emotional and physical limitations' . . .  [did] not specify the nature of such limitations, or describe how they would render plaintiff incapable of work" and thus amounted to a "conclusory opinion concerning the ultimate issue of disability, [a] matter [that] is unquestionably reserved for the Commissioner") (internal quotation omitted). Moreover, Dr. Ouweleen's report was prepared in the workers' compensation

context, "which is not governed by the same standard as applications for Social Security disability benefits." *Knighton v. Astrue*, 861 F. Supp.2d 59, 67 (N.D.N.Y. 2012).  Finally, where, as here, a physician who only saw the plaintiff "once or twice" is not "entitled to the extra weight of that of a 'treating physician.'" *Mongeur*, 722 F.2d at 1039.

Based upon the record and the written opinion of the ALJ, the Court concludes the ALJ applied the correct legal standard with regard to Plaintiff's treating sources, and that her determination in this regard was supported by substantial evidence.

### 3.    Medical-Vocational Guidelines

Plaintiff Scanlon also argues that the ALJ's Step-Five Determination was made in error because she failed to follow Acquiescence Ruling ("AR") 01-1(3).[6] Pl. Mem. at 26-29.

ALJ Reich considered Plaintiff Scanlon's age, education, work experience, and RFC for a range of sedentary work, and determined that a finding of "not

---

[6] In 2001, The SSA issued AR 01–1(3), which is applicable to cases in the Third Circuit:

> Before denying disability benefits at step five when a claimant has a nonexertional limitation(s), we must: (1) take or produce vocational evidence such as from a vocational expert, the DOT or other similar evidence (such as a learned treatise); or (2) provide notice that we intend to take or are taking administrative notice of the fact that the particular nonexertional limitation(s) does not significantly erode the occupational job base, and allow the claimant the opportunity to respond before we deny the claim.

2001 WL 65745, at *4 (2001).

disabled" would be directed by Medical-Vocational Rule 201.28.  T. 18.  In doing so, the ALJ cited, among other things, AR 01–1(3), and found that Plaintiff's ability to perform a substantial number of jobs in the national economy at the sedentary level had not been materially or substantially reduced by his nonexertional limitations, and the additional limitations had little or no effect on the occupational base of unskilled sedentary work. T. 18.

Although the ALJ did not rely on vocational expert testimony or provide administrative notice of her intent to find that Plaintiff's nonexertional limitations did not significantly erode the occupational job base, the Administrative Ruling, by its own terms, "applies only to claims in which the claimant resides in Delaware, New Jersey, Pennsylvania or the Virgin Islands at the time of the determination or decision at any level of the administrative review process; *i.e.*, initial, reconsideration, ALJ hearing or Appeals Council review." *Id.* The Court therefore finds that any failure to follow the Administrative Ruling does not require remand.

To the extent Plaintiff Scanlon argues that the ALJ erred in not calling a vocational expert, the Court finds the argument unpersuasive.  As the Second Circuit has found, "[i]f a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)).  Here, the ALJ found that Plaintiff's additional nonexertional limitations had little or no effect on

his occupational base of unskilled, sedentary work.   T. 18. The testimony of a vocational expert was not required, as the ALJ applied the appropriate legal standard, and the RFC finding was supported by substantial evidence. *See Calabrese v. Astrue,* 358 Fed.Appx.  274, 276 (2d Cir. 2009) ("In light of the ALJ's ultimate finding that [claimant's] additional [nonexertional] limitations ha[d] little or no effect on [her] occupational base of unskilled work . . . the ALJ did not err in using the [G]rids." (citation and internal quotation marks omitted)); *see also Cornell v. Colvin,* 12 Civ. 1127, 2014 WL 1572342 at *9 (W.D.N.Y. Apr. 18, 2014); SSR 83-14 ("Where it is clear that the additional limitation or restriction has very little effect on the exertional occupational base, the conclusion directed by the appropriate [Medical-Vocational Rule] would not be affected").   Because the occupational base associated with unskilled work was not significantly diminished as a result of Plaintiff's nonexertional limitations, the ALJ properly relied upon the Grids as a framework for determining disability.

### 4.   Appeals Council Evidence

Plaintiff Scanlon finally contends remand is warranted because the Appeals Council failed to explain what weight was given to the reports of Drs. Landi and McAleer. Pl. Mem. at 29-30.  Plaintiff submitted two medical opinions, dated July 1 and July 15, 2013, to the Appeals Council for review following the ALJ's decision.  Dr. Landi's Residual Functional Capacity Assessment indicated the following limitations: no lifting or carrying, standing and/or walking less than two hours per day (or "as needed"), sitting less than six hours per day, "as

needed," and no pushing or pulling. Plaintiff was assessed at 75% temporary impairment. T. 452. Dr. McAleer's neuropsychological consultation report indicated agreement with Dr. Costa's examination from one year prior that found a "cognitive basis for disability that is also enhanced and magnified with his mood capacities," such that he could not perform his prior HVAC work. T. 454-58.

On December 17, 2014, the Appeals Council received the additional evidence and made it part of the record. T. 6. It denied Plaintiff's request for review on the same date. T. 1-2.

A court may order a remand for new evidence if the evidence is both new and material and, in cases where the new evidence was not submitted to the Appeals Council, the claimant shows good cause for the failure to incorporate the evidence into the record in a prior proceeding. 42 U.S.C. § 405(g); *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988); *Cammy v. Colvin*, No. 12-CV-5810, 2015 WL 6029187, at *20 (E.D.N.Y. Oct. 15, 2015). "New" evidence means evidence that is not merely cumulative of what is already in the record. *Lisa v. Sec., Dep't Health and Human Svcs.*, 940 F.2d 40, 43 (2d Cir. 1991). "Material" evidence is evidence that is both relevant to the period for which benefits have been denied and probative. *Lisa*, 940 F.2d at 43. In addition, the concept of materiality requires "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Id.*

As an initial matter, the Appeals Council was not required to articulate a fact-specific reason for its decision to deny review. *See Countryman v. Colvin*,

No. 15-CV-06131, 2016 WL 4082730, at *11 (W.D.N.Y. Aug. 1, 2016) (collecting cases holding that there is no statutory or regulatory requirement that the Appeals Council explain its reasoning in denying review of an ALJ's decision). Additionally, Plaintiff fails to establish that the reports "add[ed] so much as to make the ALJ's decision contrary to the weight of the evidence." *Rutkowski v. Astrue*, 368 Fed.Appx. 226, 229 (2d Cir. 2010). Dr. McAleer's report simply re-stated the conclusion from Dr. Costa's previous neuropsychological examination, T. 452, and Dr. Landi's highly restrictive Residual Functional Capacity Assessment was inconsistent with his own treatment records indicating unremarkable physical examinations and medical imaging tests and conservative treatment. More importantly, the report is unsupported by the balance of the evidence in the record. T. 425-39, 454-58.

Lastly, Plaintiff Scanlon claims that the Appeals Council mistakenly considered reports by Dr. Wang dated April, 2014 through November, 2014, instead of the reports discussed above. Pl. Mem. at 30.[7] The Appeals Council Action indicates that it "*also* looked at records from Gary Wang, M.D. . . . ." but that the records related to a later period of time and were therefore not new and material. T. 2 (emphasis added). Contrary to Plaintiff's assertion, those records were not made part of the record and did not affect the disability determination.

---

[7] Plaintiff does not contend that the reports by Dr. Wang submitted after the ALJ's decision were new and material for purposes of this motion.

T. 1-2.  Accordingly, none of Plaintiff's challenges to the Appeals Council Action justify remand.

## CONCLUSION

For all of the foregoing reasons, Plaintiff Scanlon's motion for judgment on the pleadings (Dkt. No. 7) is denied, and the Commissioner's cross-motion (Dkt. No. 11) is granted.  The complaint is dismissed with prejudice.  The Clerk shall enter Judgment in favor of the Commissioner.


**SO ORDERED.**


__s/Richard J. Arcara_____
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE


DATED:  September 16, 2016